CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

FEB 0 1 2008

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| SHANNON SHERMAN, an individual, and SIMPLE MAN, INC, a Virginia Corporation, | ) ) ) | |
| Plaintiffs, | ) ) | CASE NO: |
| v. | ) ) | 7:08-CV-00060 |
| BEN & JERRY'S FRANCHISING, INC., a Vermont Corporation, and BEN & JERRY'S HOMEMADE, INC., a Vermont Corporation, and UNILEVER UNITED STATES, INC., a a New Jersey Corporation, | ) ) ) ) ) | |
| Defendants. | ) ) | |

---

## PLAINTIFF'S COMPLAINT AND DEMAND FOR A TRIAL BY JURY

---

Plaintiffs Shannon Sherman and Simple Man, Inc., hereby assert this Complaint

against defendants Ben & Jerry's Franchising, Inc., and Ben & Jerry's Homemade, Inc.

(collectively "Ben and Jerry's") and its parent corporation Unilever United States, Inc.,

and allege as follows:

### INTRODUCTION

1. This case presents the unfortunate reality that a corporate entity with abundant

   moral empathy for the downtrodden in society can turn its back on its own

   franchisees. This company wears two hats: one of a company with a social

1

conscience who advertises itself as being environmentally friendly, helping the demoralized and exploited, and supporting small-scale family farms and another in which it pushes its own franchisees to the brink of economic failure.

2. The Plaintiff, Shannon Sherman, was the mother of a boy diagnosed with a brain tumor.   While undergoing his radiation therapy, Mrs. Sherman's son would eat very little but enjoyed Ben and Jerry's ice cream.  Seeing how much joy the ice cream brought her son, Mrs. Sherman and her husband, Alan Sherman, looked into opening a Ben and Jerry's franchise.

3. Mrs. Sherman formed Simple Man, Inc., a Virginia Corporation and is its President.  Ben and Jerry's sent a Uniform Franchise Offering Circular (UFOC) to Mrs. Sherman.

4. The UFOC contained earnings information for 2002 and 2003 and Mrs. Sherman went to the Ben and Jerry's website for franchisees (i.e. the "extranet") to seek out earnings information for 2001.  If the franchisor chose to include earnings information under Item 19 of the Disclosure Document, it needed to provide accurate and true numbers.

5. Mrs. Sherman had no reason to believe that the 2001-2003 numbers would be incorrect and therefore relied on them to produce her business plan.  Mrs. Sherman even reduced her projections by 10% knowing that she would have to incur extra costs to get her store's name out into her community.

6. At no time did Ben and Jerry's revise its earnings information. Only recently did Mrs. Sherman find that Ben and Jerry's knowingly distorted the earnings information given in the UFOC to make the system look more attractive to potential buyers and that it concealed the correct data. In reality, they were hiding the truth to have innocent purchasers, such as Mrs. Sherman, put their life savings into buying a store that was destined to fail.

7. After the Shermans decided to open a store, they needed to find a location. Mrs. Sherman first found a site in Christianburg, Virginia which was in the center of the retail hub and met Ben and Jerry's published criteria. The lease was not available for about one year so Mrs. Sherman searched for an alternate open site. Mrs. Sherman found an open site in Blacksburg, Virginia which Ben and Jerry's quickly approved even though it did not meet Ben and Jerry's own criteria on three fronts.

8. When the Christianburg, Virginia site became available, Mrs. Sherman completed the required packet and submitted it for approval three different times. Each time, Ben and Jerry's arbitrarily rejected the site with no reasonable explanation, even though it met the required criteria.

9. Upon opening her store, Mrs. Sherman's first order of business was getting her name out in the community. She spent large resources to advertise her location.

10. Mrs. Sherman felt that she was Ben and Jerry's community representative and wanted to promote the feeling that "Ben and Jerry's cares for local communities".

She spent money and time supporting charitable causes and she held benefits for

disaster relief. She worked hard promoting her store and increasing Ben and

Jerry's good will. Her business plan factored in amounts for advertising and

charitable contributions.

11. Despite her earnest efforts, Mrs. Sherman's business was losing money and she

could not figure out why.

12. She became worried when she saw an increase in the number of extranet postings

showing other stores nationally and locally incurring large losses.

13. Purportedly to combat franchisee losses, Ben and Jerry's deceitfully implemented

a new list of "promotions." The "Waffle Truth" campaign led Mrs. Sherman's

customers to Al Gore's website and encouraged them to buy his book and DVD.

The second "promotion" asked Mrs. Sherman's customers to contact their

congressperson or senator to cut military spending and feed the children instead.

14. These promotions were funded with the money that the franchisees had paid Ben

& Jerry's for use in advertising and not from Ben & Jerry's corporate funds.

These "promotions" actually turned away many customers who viewed the

advertisements as political in nature.

15. Ben and Jerry's next step in "helping" Mrs. Sherman was to provide its products

to two stores in Mrs. Sherman's area. These stores, Macado's Sports Bar and

Boston Beanery, became competitive rivals of Mrs. Sherman and reduced her

ability to earn income. Mrs. Sherman had not anticipated this turn of events.

4

16. Mrs. Sherman would have anticipated Ben and Jerry's providing products to a "White Napkin, White Tablecloth" restaurants because Ben and Jerry's provisions allowed it to do so.  On two occasions, at Discover Day, and prior to opening her store, Mrs. Sherman was explicitly explained what constituted a "White Napkin, White Tablecloth" restaurant.

17. Macado's and Boston Beanery did not fit those requirements.  Further, these two stores advertised in flyers and mailings that they sold Ben and Jerry's products for carry-out – all of which violated Ben and Jerry's policy.

18. Unsurprisingly, Mrs. Sherman suffered losses.  She started having to pay business bills from her personal funds.  Instead of providing the ongoing assistance, advice and techniques on managing and operating the store as required of Ben and Jerry's under the Franchise Agreement, Ben and Jerry's decided to passively watch Mrs. Sherman fail.

19. Mrs. Sherman suffered from a lack of support and assistance.  Ben and Jerry's championed that it would provide on-site supervision and assistance to Mrs. Sherman.  Mrs. Sherman repeatedly asked Debra Heintz, Director of Retail Operations, to visit the store personally so that she or another officer could help her store turn around and in-turn make money for Ben and Jerry's.  Mrs. Sherman's requests for these visits were rejected by Ben & Jerry's.

20. When Mrs. Sherman was at her low point, having just suffered an $85,000 loss in 2006, Ben and Jerry's cheerfully decided to request that she join the "Stores in

Trouble" program.  Mrs. Sherman knew the program well and had already implemented many of the recommendations in a frustrated effort to recover.  She agreed to Ben and Jerry's offer to provide business analysis help.  Mrs. Sherman provided the required information and received a very unprofessional and flawed analysis.  The analysis suggested, among other things, that the Sherman's operate the store with one employee, preferably one of the Shermans.  The analysis further suggested that the store discontinue collecting tips which they advertised would be donated monthly to a designated local charity of the Sherman's choice.  Instead, the analysis suggested the Mrs. Sherman reduce their employee wages and let the employees have the tips, thus saving labor expenses.  The analysis was so unprofessional that it simply removed expenses from the analysis without reallocating them.

21. Ben and Jerry's suffered from serious discontent amongst its franchises.  There is a split between those that opened pre-2001 and those that opened post-2001.  A news article describes the feeling of angst among post-2001 owners who looked to the Ben and Jerry's as a way to make a living.

22. What Mrs. Sherman and other post-2001 owners did not anticipate was that Ben and Jerry's would  remove all infrastructure for stores that were opened after 2001, which caused many post-2001 stores to close or to be put up for sale.  A reporter laid out the fundamental flaws in Ben and Jerry's business model:  failing to increase brand awareness outside of the northeast, increasing the number of stores without any sort of cohesion, failing to provide well-thought out plans to

6

draw down costs of opening stores, and misguidedly blaming storeowners of not doing enough to promote, market, etc.

23. Mrs. Sherman's store became a tragedy for her. She lost large amounts of money and lost faith in a company that claimed to help the downtrodden. She learned that Ben and Jerry's falsified the earnings claim in the UFOC they sent her – the same numbers that she used to produce her detailed business plan. She learned that Ben and Jerry's employees themselves admitted that earnings claims given to potential franchisees were increased to look more favorable on paper than actuality. Instead of fixing the problems, Ben and Jerry's enrolled stores in a "Stores in Trouble" program.

24. The Shermans opened the Ben and Jerry's store in honor of their son, a boy who enjoyed Ben and Jerry's ice cream while undergoing radiation therapy for a brain tumor. Tragically, their son passed away about two years ago. The Shermans had to deal with loss after loss, both emotionally and financially. This is a story of a company that pushes for the rights of small-family farmers and prides itself on having abundant moral empathy for the downtrodden in society. This is a case telling Ben and Jerry's to take a look in its own backyard before telling everyone else how to live. This is a case of a hypocritical company that wears two hats: one public and one private.

25. Mrs. Sherman knew the Franchisor and Defendant, Ben and Jerry's, as a company that had a social conscious – whether it was ensuring that its milk came from cows not treated with bovine growth hormone or in its determination to help small

7

family farms.  On paper, Ben and Jerry's portrayed themselves as being kind and friendly to all.  In reality, Ben and Jerry's turned its back on Mrs. Sherman.

26. Ben and Jerry's hurt Mrs. Sherman and the other franchise owners by selling franchises when they knew their business model had serious defects.  Instead of trying to find ways to fix their system, Ben and Jerry's decided to put its own bottom line first and to keep selling troubled franchises.

27. Unsurprisingly, many stores failed.  And to "help" the distressed franchisees, Ben and Jerry's enrolled them into the "Stores in Trouble" program.  It should have been called the "Franchisor in Trouble" program.

28. Reporters began interviewing franchise owners and Ben and Jerry's employees. Their reports began to shed light on Ben and Jerry's harmful and unconscionable actions which have caused over forty franchised stores to close their business operations and forced many other franchisees to place their stores up for sale.

29. In one instance, a reporter asked a Ben and Jerry's employee why it did not provide sufficient data to franchisee owners.  The employee's response was that giving out too much information would open Ben and Jerry's to "potential lawsuits...providing too much information could come back to haunt us."  Only later did this employee backpedal and say that "more disclosing" would have been better.

30. Mrs. Sherman lost large amounts of money because she believed in the principles that Ben and Jerry's promotes. Instead of helping Mrs. Sherman, Ben and Jerry's exploited her.

31. Mrs. Sherman now seeks justice in the court system for the wrongs done by Ben and Jerry's.

## PARTIES

32. Plaintiff Shannon Sherman is a citizen of the State of Virginia, residing at 1144 Smith Creek Road, Christianburg, Virginia 24073.

33. Plaintiff Simple Man, Inc., is a corporation organized and existing under the laws of the Commonwealth of Virginia, with its principal place of business in Blacksburg, Virginia.

34. Under information and belief, Defendant Ben & Jerry's Franchising Inc., and Ben & Jerry's Homemade Holdings, Inc., are corporations headquartered at 30 Community Drive, South Burlington, Vermont 05403.

35. Under information and belief, Defendant Unilever United States, Inc., is a corporations headquartered at 700 Sylvan Ave., Englewood Cliffs, New Jersey 07632.

## JURISDICTION AND VENUE

36. Diversity jurisdiction exists pursuant to 28 U.S.C. § 1332(a) and pursuant to principles of supplemental jurisdiction, 28 U.S.C. § 1367.

37. The amount in controversy is in excess of $75,000.

38. This Court has personal jurisdiction over the Defendants by virtue of, among other things, their systematic and continuous business operations under the laws of the State of Virginia.

39. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(a)(2).

### ALLEGATIONS TO ALL COUNTS

#### The Franchising Opportunity with Ben and Jerry's

40. In 2002, plaintiff Shannon Sherman's son was diagnosed with a brain tumor. While undergoing radiation therapy, Mrs. Sherman's son had an appetite for only one food:  Ben & Jerry's ice cream. As a consequence, Mrs. Sherman often visited a Ben & Jerry's Scoop Shop in Charlottesville, Virginia.  Inspired by Ben & Jerry's perceived image as a company with a social conscience, Mrs. Sherman decided to investigate whether a Ben & Jerry's Scoop Shop would be viable in the Roanoke, Christianburg, and Blacksburg Virginia areas.

41. On March 15, 2004, Mrs. Sherman received a Uniform Franchise Offering Circular (UFOC) from Ben & Jerry's. The UFOC is a disclosure document that the government requires franchisors to provide to prospective franchisees to assist prospective franchisees to evaluate the financial viability of the franchise opportunity.  Often one of the most important items in the UFOC is what is known as Item 19 Earnings Claim.  In Item 19, if franchisors choose to provide earnings information, they must provide accurate numbers that are historical,

written, and formal. Franchisors in this Item must also provide tangible and accurate back-up information.

42. Item 19 of the UFOC specifically provided to Mrs. Sherman, entitled "Earnings Claims," represented, inter alia, that average gross sales were $364,892 for the year 2003.  Item 19 of the UFOC also stated that the 2003 dollar sales figure represented a 0.63% increase from the previous year 2002.  In addition, median gross sales were listed as $311,728.  In preparing her business plan, Mrs. Sherman conservatively reduced her projections by 10% to account for extra costs in promoting her new store.

43. Unaware to Mrs. Sherman, Ben and Jerry's distorted the Earnings Claims found in Item 19 to make the system look more attractive on paper than they actually were in reality.

44. Mrs. Sherman also obtained year 2001 figures from Ben & Jerry's website for franchisees (i.e. the "extranet"), which broke down income and expenses and profit or loss for the system, for each region, for each type of store, and by sales range.

45. Using the flawed figures provided by Ben and Jerry's in Item 19 and the figures from the extranet, Mrs. Sherman prepared her business plan that caused her to lose money each year culminating to a loss of over $85,000.00 out of her own pocket in 2006.

46. Mrs. Sherman's current location, in Blacksburg, Virginia, was approved by Ben & Jerry's. The location, however, did not meet three major criteria, including: "Near branded retail"; "Near branded restaurants"; and "Near Movie Theaters."

47. Mrs. Sherman initially proposed a site in Christianburg, Virginia, for her Scoop Shop. The location met Ben & Jerry's published criteria, which was available to Mrs. Sherman on the extranet. However, Ben & Jerry's arbitrarily rejected the Christianburg location.

48. Mrs. Sherman formed plaintiff Simple Man, Inc. and in February 2005, Mrs. Sherman finally opened her Scoop Shop.  Understanding that strong advertising and charitable donations were important to spread the word about her new store, Mrs. Sherman strongly invested time and resources attending to both.  Further, Mrs. Sherman felt that her store was Ben and Jerry's representative in the community and so spent money and time into supporting charitable causes and having benefits for disaster relief.

49. By May 2005, Mrs. Sherman starting seeing a large number of extranet postings showing other stores incurring losses as well.

50. Instead of addressing this situation, Ben and Jerry's implemented promotions that did not help sell ice cream, but instead pushed its political agenda at the cost of the franchisee's bottom line.  Mrs. Sherman was informed by Ben & Jerry's that her Scoop Shop would engage in fundraising activities for political figures. Specifically, Ben & Jerry's "Waffle Truth" campaign deceitfully led Mrs. Sherman's customers to Al Gore's website and encouraged them to buy his book or DVD.  Ben & Jerry's artfully called this a "promotion" for Ben & Jerry's Scoop Shops.

51. Similarly, another Ben & Jerry's "promotion" asked Mrs. Sherman's customers to contact their congressperson or senator to cut military spending and feed the children.

52. These "promotional" materials were funded through advertising charges paid by the franchisees (the "Fund"). Ben and Jerry's had a duty to produce these types of "promotional" materials from avenues outside of the Fund and to make the use of such material optional by the franchisees. Instead, Ben and Jerry's pushed this material on the franchisees under the veil of "promotional" materials that would benefit the franchisees.

53. Further contributing to this loss was Ben and Jerry's decision to supply stores with Ben and Jerry's products which did not fall under the "White Napkin, White Tablecloth" provision set forth by Ben and Jerry's.

54. Ben and Jerry's provided Macado's Sports Bar with Ben and Jerry's products even though it went against Ben and Jerry's contract with Mrs. Sherman. Macado's had locations in close proximity to Mrs. Sherman's store.

55. On two occasions, Discovery Day and prior to opening the franchise, the Shermans were told by Ben and Jerry's employees that "White Napkin, White Tablecloth" referred to finer restaurants who were allowed to serve Ben and Jerry's ice cream. Further, Ben and Jerry employees stated that "White Napkin, White Tablecloth" restaurants were restricted in advertising their Ben and Jerry's ice cream and were not allowed to package Ben and Jerry's ice cream to carry-out ("to-go"). However, Macado's did not fit the requirement of "White Napkin, White Tablecloth."

56. With Ben and Jerry's ice cream in stock, Macado's began fully advertising that "you don't have to go elsewhere to get B&J, we now have it." Macado's professionally made table cards advertising the ice cream. Also, Macado's sold Ben and Jerry's ice cream to-go.

13

57. Ben and Jerry's also allowed Boston Beanery, a bar and restaurant in the same area as Mrs. Sherman's store, the rights to sell Ben and Jerry's ice cream. Boston Beanery started sending out coupons in the mail advertising the sale of Ben and Jerry's ice cream. Additionally, Boston Beanery sold Ben and Jerry's ice cream to-go. Ben and Jerry's allowed two restaurants to unfairly compete with Mrs. Sherman, especially since they were able to sell other products as well. Mrs. Sherman sustained a loss in revenue from Ben and Jerry's direct violation of their "White Napkin, White Tablecloth" provision.

58. Mrs. Sherman suffered from a lack of management by Ben and Jerry's. Ben and Jerry's had a duty to provide ongoing assistance to Mrs. Sherman through advice and updated techniques on managing and operating the store, including new inventory and cost-control methods, updated store layout and designs, and new products and marketing techniques. Ben and Jerry's only offered to enroll Mrs. Sherman in the "Stores in Trouble" program after Mrs. Sherman had suffered huge losses instead of ongoing throughout Mrs. Sherman's ownership.

59. Mrs. Sherman believes that she implemented many of the recommendations set forth in the "Stores in Trouble" program and therefore agreed to join the "Stores in Trouble" program for aid in business analysis only. She provided Profit and Loss forms for 2005, 2006 and first and second quarter of 2007. Ben and Jerry's then provided unprofessional and flawed analysis of Mrs. Sherman's store.

60. Mrs. Sherman also suffered from a lack of ongoing support and assistance from Ben and Jerry's. Ben and Jerry's sent two employees to Mrs. Sherman's store for two days during the opening, but have not sent anyone since.

14

61. In order for Ben and Jerry's to better gauge the gravity of Mrs. Sherman's store, on more than one occasion and most recently in August, 2007, the Shermans invited Debra Heintz, Director of Retail Operations to visit the store personally. Yet, neither Ms. Heintz nor any other employees have visited the store. Mr. Sherman, on the other hand has visited Ben and Jerry's headquarters twice.

62. Ben and Jerry's poor business model harmed Mrs. Sherman. Ben and Jerry's different store types range from kiosks to stores. Instead of providing comprehensive data to potential franchisees based on the type of store they purchase, a Ben and Jerry's employee stated in an interview that they did not do so "citing potential lawsuits" and "providing too much information could come back to haunt us." The employee then backpedaled to, "Maybe that's the best way to go, being more disclosing." Mrs. Sherman was sufficiently harmed by Ben and Jerry's poor business model, namely its restriction on providing detailed store data to its franchisees.

63. The poor business model pushed Ben and Jerry's franchisees to close 40 stores in 2006 and to place many of their stores up for sale. Ben and Jerry's knew that it had significant problems with its business model as it launched the "Stores in Trouble" program.

64. In a news article, the journalist interviewed franchise owners to show the discontent of post-2001 owners versus their pre-2001 counterparts. The pre-2001 owners had the integral support of Ben and Jerry's which help them succeed. But in 2001, Ben and Jerry's virtually removed all infrastructure support for stores that opened after 2001.

65. The article describes Ben and Jerry's poor business model including its: failing to increase brand awareness outside the northeast, increasing the number of stores without any sort of cohesion, failing to deliver well-thought out plans to draw down costs of opening stores, and blaming storeowners of not doing enough marketing, promotions, etc.

66. The Shermans have had to deal with the loss of their son due to a brain tumor. All Mrs. Sherman wanted to do was open a store that sold the ice cream that her son loved from the company that Mrs. Sherman believed had a social conscious. If Ben and Jerry's wants to prove its claim that it wants to save family farms, then why not Mrs. Sherman – an actual family farmer and franchisee.

## COUNT I – FRAUDULENT INDUCEMENT

67. Plaintiffs reallege, as if fully restated herein, their allegations set forth in the paragraphs above.

68. Ben and Jerry's is guilty of fraudulently inducing the plaintiffs into purchasing a franchise.

69. Ben and Jerry's made fraudulent misrepresentations concerning the earnings claim under Item 19 of the UFOC.

70. Ben and Jerry's, its officer agents, and employees, fraudulently induced plaintiffs into believing that Ben and Jerry's would only allow "White Napkin, White Tablecloth" restaurants in plaintiffs' area the right to sell Ben and Jerry's products.

16

71. As Ben and Jerry's intended, the plaintiffs reasonably relied on and were induced by the fraudulent representations set forth above, with such reliance resulting in foreseeable damage to plaintiffs.

## COUNT II – NEGLIGENT MISREPRESENTATION

72. Plaintiffs reallege, as if fully restated herein, their allegations set forth in the paragraphs above.

73. Ben and Jerry's is guilty of negligently misrepresenting facts and omitting other important facts, as set for above, especially concerning the profitability of the store, the "White Napkin, White Tablecloth" distribution, use of advertising campaigns, and generation of income.

74. The representations and omissions of Ben and Jerry's, its agents, officers and/or employees set forth above were false and misleading at the time they were made and were made negligently and without the exercise of due care.

75. As Ben and Jerry's intended, plaintiffs reasonably relied on and were induced by the false representations and omissions set forth above, with such reliance resulting in substantial foreseeable damage to plaintiffs.

## COUNT III – ESTOPPEL – RELIANCE ON
## BEN AND JERRY'S CONDUCT

76. Plaintiffs reallege, as if fully restated herein, their allegations set forth in the paragraphs above.

17

77. Throughout the implementation of their fraud, defendants have engaged in affirmative conduct and made representations, including those described herein, with the intent and effect of making plaintiffs rely on the information given to him by defendant to the sole benefit of the defendant.

78. Plaintiffs relied on Ben and Jerry's conduct in such a manner as to change their position for the worse because plaintiffs did not know that Ben and Jerry's conduct was misleading until it was too late.

79. As Ben and Jerry's intended, plaintiffs reasonably relied on and were induced by the defendant's conduct set forth above, with such reliance resulting in substantial foreseeable damage to plaintiffs.

## COUNT IV – BREACH OF CONTRACT

80. Plaintiffs reallege, as if fully restated herein, their allegations set forth in the paragraphs above.

81. Ben and Jerry's entered into various contracts and agreements with the plaintiffs, including the Franchise Agreement and agreements related to the equipment, the UFOC, and the business activities.

82. Ben and Jerry's breached its contracts with the plaintiffs by, among other things, failing to enforce its "White Napkin, White Tablecloth" program, using the advertising campaign to divert money to further its political agenda instead of generating revenue, failing to approve the plaintiffs' purchase of the Christianburg location even though the location met all the prerequisites for new

sites for Ben and Jerry's, general lack of marketing support, and experiencing supply shortages.

83. As a result of the defendant's unlawful conduct, plaintiffs suffered substantial damages, including lost profits, damages to the good will, profitability and value of their franchise businesses, and lost business reputation, as well as other direct, indirect and consequential damages and were forced to expend time and money, including the payment of court costs and attorneys' fees.

**COUNT V – VIOLATION OF VIRGINIA RETAIL FRANCHISING ACT – BUSINESS FRANCHISE GUIDE VA (CCH) P 3468.05 SEC. 59.1-226 – PROHIBITED ACTS**

84. Plaintiffs reallege, as if fully restated herein, their allegations set forth in the paragraphs above.

85. Under the Virginia Retail Franchising Act, it is unlawful for a franchisor to provide income or earning claims to the buyer unless it has "documented data to substantiate the claims of income" and has provided this data to the buyer.

86. By engaging in the conduct stated above, Ben and Jerry's violated this provision.

87. As a result of Ben and Jerry's unlawful conduct, plaintiffs sustained substantial foreseeable injury and harm.

**COUNT VI – VIOLATION OF VIRGINIA RETAIL FRANCHISING ACT – BUSINESS FRANCHISE GUIDE VA (CCH) P 3460.07 Sec. 13.1-563. – UNLAWFUL OFFERS**

88. Plaintiffs reallege, as if fully restated herein, their allegations set forth in the paragraphs above.

89. Under Sec. 13.1-563, it is unlawful for any franchisor:

> "a) to employ any device, scheme, or artifice to defraud; b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to avoid misleading the offeree; [and] (c) to engage in any transaction, practice or course of business which operates or would operate as a fraud."

90. By engaging in the conduct stated above, Ben and Jerry's violated this provision.

91. As a result of Ben and Jerry's unlawful offer, plaintiffs sustained substantial foreseeable injury and harm.

**COUNT VII – VIOLATION OF VIRGINIA DISCLOSURE REGISTRATION ACT – BUSINESS FRANCHISE GUIDE VA (CCH) P 3460.02 Sec. 13.1-558 – POLICY OF THE COMMONWEALTH**

92. Plaintiffs reallege, as if fully restated herein, their allegations set forth in the paragraphs above.

93. Under Sec. 13.1-558, it is the policy of the Commonwealth to

> "correct as rapidly as practicable such inequities as may exist in the franchise system so as to establish a more even balance of power between franchisors and franchisees; to require franchisors to deal fairly with their franchisees with reference to all aspects of the franchise relationship and

to provide franchisees more direct, simple, and complete judicial relief against franchisors who fail to deal in a lawful manner with them."

94. By engaging in the conduct stated above, Ben and Jerry's violated this provision.

95. As a result of Ben and Jerry's unlawful conduct, plaintiffs sustained substantial foreseeable injury and harm.

**COUNT VIII – VIOLATION OF VIRGINIA DISCLOSURE REGISTRATION ACT – BUSINESS FRANCHISE GUIDE VA (CCH) P 3460.08 Sec. 13.1-564 – UNDUE INFLUENCE**

96. Plaintiffs reallege, as if fully restated herein, their allegations set forth in the paragraphs above.

97. Under Sec. 13.1-564, it is unlawful for a franchisor to "use undue influence to induce a franchisee to surrender any right given to him by any provision contained in the franchise."

98. By engaging in the conduct stated above, Ben and Jerry's violated this provision.

99. As a result of Ben and Jerry's unlawful conduct, plaintiffs sustained substantial foreseeable injury and harm.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff demands judgment against Defendants and the following relief

1. Compensatory damages in an amount to be proven at trial

2. Punitive damages in an amount that the jury deems sufficient to punish and deter defendant's conduct

21

3. Prejudgment and post-judgment interest

4. Reasonable costs and attorneys' fees

5. Such other relief that this Honorable Court deems proper.


## DEMAND FOR JURY TRIAL


Defendant demands that this case be resolved by trial by jury.


Respectfully Submitted by:


/s/ Jeffrey Goldstein
Jeffrey M. Goldstein
Goldstein Law Group
P.O. Box 2278
Leesburg, VA  20177
Facsimile: (202) 223-2002
Phone: (202) 293-3947


/s/ Arthur P. Strickland
Arthur P. Strickland, Esq. (VSB#13337)
ARTHUR P. STRICKLAND, P.C.
P.O. Box 2866
Roanoke, VA  24001-2866
Telephone: (540) 982-7787
Facsimile:  (540) 342-2909